These accessories are separately reimbursable by Medicare Part B according to their individual Health Common Procedure Coding System (HCPCS) identifiers. These accessories (listed with the corresponding  DMERC Region C,  Texas 2002 allowables in parenthesis)  included, but were not limited to:

    a.  K0021        anti-tipping devices  ($41.24)

    b.  K0093        rear wheel zero pressure tire tubes (flat free insert)($302.26)

    c.  K0097        wheel zero pressure tubes (flat free insert) ($120.72)

    d.  K0031        seat belt/pelvic strap ($111.22)

    e.  K0058        seat depth 17"' or 18" ($60.07)

    f.  K0086        U-1 lead add batteries ($214.88)

    g.  K0083        22 NF gel cell batteries ($277.58)

    h.  K0085        group 24 gel cell batteries ($370.18).

110.    None of these accessory items provides a medical benefit *per se* and there are no medical necessity coverage criteria specific to these items.   The accessories can be characterized as convenience and comfort items or "bells and whistles."

111.    The actual combination of accessories which Defendant added onto the base K0011 electric wheelchair from at least January 1994 to date varied from beneficiary to beneficiary.  Virtually every beneficiary received some combination of these accessories, the actual mix being determined solely by the Defendant. Typical combinations of these accessories would include at least five of the items (some of the items, *e.g.,* the various tire/tube and battery options, would be

mutually exclusive).   The total for a typical combination of six accessory items (the package of K0093, K0086, K0097, K0058, K0021 and K0031) provided to thousands of Medicare Part B beneficiaries by Defendant would be an additional $850.39 in allowables in Region C, Texas in 2002.  From at least at least January 1994 to date, Defendant supplied very few, if any, base K0011 electric wheelchairs (*i.e., K0011* electric wheelchairs without any of these comfort and convenience accessories) to Medicare Part B beneficiaries.

112.      The decision whether to provide these accessories to Medicare Part B beneficiaries was made solely Defendant.  Nothing in Section A of the Certificate of Medical Necessity (CMN) for electric wheelchairs utilized by Defendant from 1996 to date actually   indicates whether these accessories were being provided to beneficiaries by Defendant.  Nothing in the physician responses in Section B of the CMN utilized by Defendant from 1996 to date addresses the medical necessity for these accessories.    The prescribing physicians were not even aware whether or not their patients were being provided these accessories.

113.   Defendant from at least January 1994 to date Defendant has submitted to Medicare and other Government Health Care Programs tens of thousands of false and fraudulent claims for payment of medically unnecessary electric wheelchair accessories.  All or virtually all of the electric wheelchair claims filed by Defendant from January 1994 to date included a claim for one or more medically unnecessary convenience and comfort accessory.

114.   All or virtually all, of Defendant's tens of thousands reimbursement claims for K0011 electric wheelchair accessories   were over paid from at least January

1994 to date by Government Health Care Programs in the amount of approximately $850 per claim.

115.   Defendant was at all times aware of the actual coverage criteria and knowingly and willfully filed false Medicare Part B reimbursement claims for electric wheelchair accessories provided to beneficiaries that Defendant knew were not medically necessary.

116.   From at least January 1994 date, all of Defendant's reimbursement claims for electric wheelchair accessories have been routinely certified by Defendant as medically necessary, regardless of the beneficiary's condition and regardless of the truth or falsity of that representation.   The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

117.   Defendant, with knowledge of the false certifications, has routinely presented false and fraudulent claims for payment of medically unnecessary electric wheelchairs accessories to Medicare, Medicaid, and other Government Health Care Programs.

118.   A sample list, with the beneficiary identities redacted, of false and fraudulent claims in which Defendant was paid for medically unnecessary electric wheelchair accessories is attached hereto as Exhibit C.   A sample delivery invoice, with the beneficiary identity redacted, reflecting Defendant's typical accessory package is attached hereto as Exhibit D.

### C. False certifications and false claims for medically unnecessary electric wheelchairs and POVs

119.    Medicare law prohibits distribution of "sample" or "form" CMNs to physicians to instruct them on how a CMN should be completed to support coverage. *See* 42 U.S.C. §1395m(j)(2).

120.    The CMN  used by Defendant since on or about 1996  to support its claims for reimbursement  for electric wheelchairs and POVs  contains three "yes or no"  questions necessary to establish medical necessity (a third answer, "Does not Apply",  is possible, but unrealistic).  These three dispositive questions are electric wheelchair CMN questions 1, 6 and 7 and POV CMN questions 6, 7 and 12.   If these three questions are answered yes by the prescribing physician, Defendant would determine that the medical necessity coverage criteria to be satisfied and would make the sale.

121.    Thus, on the slim and normally easily obtained documentation of three "yes or no" questions, Defendant has filed and been paid for tens of thousands of Medicare Part B reimbursement claims for electric wheelchairs and POVs worth hundreds of millions of dollars.

122.    From on or about November 2002 to on or about February 2003, Defendant utilized a form called a "Physicians Supplemental Evaluation" which was sent to the prescribing physician along with the CMN.

123.    On information and belief, the title of the "Physician's Supplemental Evaluation" form was knowingly and willfully calculated by Defendant to be misleading.   While the Physician's Supplemental Evaluation form on its face

purported to be an effort to obtain information supporting medical necessity in addition to that embodied in the CMN, on information and belief its actual purpose and effect  was to provide direct "coaching" on the "correct" CMN answers.    The Physician's Supplemental Evaluation for POVs contained the statement to physicians that:

> If you answered **"Yes" to questions 6, 7 12 and "No" to question 8** [emphasis in original] on the Certificate of Medical Necessity, you have indicated that your patient, _____, likely meets Medicare's coverage criteria for a scooter.

124.    On information and belief similar language was included in the Physician's Supplemental Evaluation for electric wheelchairs.

125.    On information and belief, the prescribing physicians, all highly-trained professionals possessed of extensive education, understood from the Physician's Supplemental Evaluation form the "correct" answers to the dispositive CMN questions.    On information and belief, the prescribing physicians also understood (as Defendant clearly intended) that they were being informed in writing by Defendant that only their "yes" answers would indicate medical necessity.    On information and belief, the vast majority of prescribing physicians who received this highly effective "coaching" from Defendant certified medical necessity.

126.    On information and belief, Defendant made it a practice to illegally "coach" physicians on the completion of CMNs by providing "sample" or "form" answers utilizing a variety of other forms and other mechanisms before and after the period Defendant utilized the Physician's Supplemental Evaluation form.    On

40

information and belief, some of Defendant's schemes for providing "sample" or "form" "correct" CMN answers to prescribing physicians were systematic and companywide. Other mechanisms were ad hoc and individual. For example, on information and belief, individual MCs would often draft individual fax cover sheets to prescribing physicians providing the "correct" answers rather than relying on a printed form.

127. From at least January 1994 to date, an unknown, but on information and belief very large, number of Defendant's reimbursement claims for electric wheelchairs and POVs have been routinely certified by Defendant as medically necessary regardless of the fact that Defendant suggested "sample" or "form" "correct" CMN answers to the prescribing physician in violation of the Medicare law. The false certifications of medical necessity were intended to support, and were used to support, false claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

128. Defendant from at least January 1994 to date has submitted to Medicare and other Government Health Care Programs an unknown, but on information and belief very large, number of false and fraudulent claims for payment of medically unnecessary electric wheelchairs and POVs where the Defendant suggested answers to the CMN to the prescribing physician in violation of Medicare law.

129. An unknown, but on information and belief very large, number of Defendant's false and fraudulent reimbursement claims for medically unnecessary K0011 electric wheelchairs as indicated in the table below were paid from January 1994 to date by Government Health Care Programs in the amount of approximately

41

$5,046 per claim.  An unknown, but on information and belief very large, number of Defendant's false and fraudulent claims for medically unnecessary E1230 POVs as indicated in the table below were paid from at least January 1994 to date by Government Health Care Programs in the amount of approximately $1,923 per claim.

|  | K0011 | K0010 | E1230 | K0001 |
|---|---|---|---|---|
| New | $5,046.00 | $4,259.90 | $1,922.52 | $54.62/month |
| Used | $3,784.00 | $3,194.93 | $1,520.49 | |

130.  An unknown, but on information and belief very large, number of Defendant's reimbursement claims for K0011 electric wheelchairs and POVs were over paid from at least January 1994 to date by Government Health Care Programs in the amount of approximately $5,046 to $1,923 per claim.

131.  Defendant was at all times aware of the statutory prohibition on suppliers providing answers to CMN questions to prescribing physicians and knowingly and willfully filed false Medicare Part B reimbursement claims for medically unnecessary electric wheelchairs and POVs provided to beneficiaries.

132.  From at least January 1994 to date, an unknown, but on information and belief very large, number of Defendant's reimbursement claims for electric wheelchairs and POVs have been routinely certified by Defendant as medically necessary.   The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

133.   Defendant, with knowledge that it suggested CMN answers to prescribing physicians in violation of Medicare law for medically unnecessary electric wheelchairs and POVs, has routinely presented false and fraudulent claims for payment of electric wheelchairs and POVs to Medicare, Medicaid, and other Government Health Care Programs.

134.     A sample of Defendant's  "Physician's Supplemental Evaluation" form, with the beneficiary name redacted, through which the Defendant provided "correct" answers  to the CMNs to the prescribing physicians is attached hereto as Exhibit E.

**D. False certifications and false claims for providing the K0011 electric wheelchair in lieu of the E1230 POV as a less costly medically reasonable alternative**

135.     In addition to the two basic types of electric wheelchairs covered by Medicare Part B and typically provided to Medicare Part B beneficiaries, Medicare also covers power operated vehicles (POVs) which are often referred to as "scooters."  Defendant's corporate name, The Scooter Store, refers to the POV rather than to the electric wheelchairs which are Defendant's primary product.    The POV is a relatively inexpensive item of equipment compared to the electric wheelchair, and is identified under the Health Common Procedure Coding System (HCPCS) as an E1230 POV.

136.     The primary difference (other than allowable amount) between the E1230 POV and the K0011 electric wheelchair  is that the POV is operated and

controlled via a tiller and the K0011 electric wheelchair  is operated and controlled via an armrest mounted "joystick."  (A secondary difference is that the K0011 electric wheelchair has a smaller turning circle, however this feature relates purely to convenience and utility and not to medical necessity.)   Only a very small portion of the beneficiaries who qualify medically for an electric wheelchair or POV require or can benefit therapeutically from  a joystick control rather than a tiller control.

137.    The medical necessity coverage criteria for a K0011 specify that the beneficiary ". . . without the use of a wheelchair the patient would otherwise be bed or chair confined. . . " which the DMERCs have interpreted through their LMRPs to mean "usually . . . totally nonambulatory."   The medical necessity coverage criteria for POVs specify that ". . . without the use of the [POV] the beneficiary would not be able to move around in their residence. . ."   These coverage criteria are intentionally slightly different formulations of the same criterion - the beneficiary must be bed or chair confined all or virtually all the time without the equipment.

138.    The medical necessity coverage criteria for a K0011 electric wheelchair and an E1230 POV are essentially the same.   The Certificates of Medical Necessity (CMNs) whereby the beneficiary's treating physician certifies the medical necessity for electric wheelchairs and POVs make no meaningful distinction between the medical necessity for K0011 electric wheelchairs and E1230 POVs.  The CMNs for electric wheelchairs and POVs do not address the medical need for the tiller versus joystick, which is the primary distinction

44

between a K0011 electric wheelchair and an E1230 POV, and the beneficiary's physician does not address this distinction in any way in certifying medical necessity.

139.     On information and belief, the vast majority of physicians who certified the medical necessity for K0011 electric wheelchairs provided by Defendant to Medicare Part B beneficiaries was not even aware of the operational difference and had no idea of the relative therapeutic value of the two types of equipment for their patients.

140.     The decisions whether to supply Medicare Part B beneficiaries with a K0011 electric wheelchair in lieu of less costly equipment providing identical therapeutic value were made solely by Defendant.

141.     On information and belief, more than 85 percent of the product mix provided by Defendant to Medicare Part B beneficiaries since at least January 1994 to date has been the very expensive K0011 electric wheelchair, rather than the much less expensive E1230 POV.    This is despite the fact that, on information and belief, the vast majority of beneficiaries who respond to the advertising campaign of the Defendant are initially seeking to buy scooters or POVs from The Scooter Store and not K0011 electric wheelchairs.

142.     On information and belief, through a combination of procedures, policies and salesmanship, Defendant consciously and deliberately redirected the majority of the Medicare beneficiaries responding to Defendant's massive advertising campaign and seeking to buy inexpensive scooters towards significantly more expensive electric wheelchairs.

45

143.    On information and belief, Defendant sought to and did control and manipulate the dialogue between its sales personnel known as Mobility Consultants, or MCs, and beneficiaries so as to direct the beneficiary orders away from the relatively inexpensive E1230 POV and towards the very expensive K0011 electric wheelchair.  On information and belief, this result was produced by requiring the MCs to use a "script" for their dialogue with the beneficiaries. Defendant maintains this "script" as a closely-guarded secret.

144.    On information and belief, the results of the dialogue between individual beneficiaries  and MCs, controlled and manipulated by the "script" to direct beneficiaries away form ordering inexpensive E1230 POVs and towards ordering expensive K0011 electric wheelchairs, are memorialized electronically in Defendant's document know as the "e packet."   On information and belief, these "e packets" are maintained in Defendant's sales files and never made available to Medicare or any third party.

145.    Medicare reimburses suppliers like Defendant for assigned Medicare Part B reimbursement claims for electric wheelchairs based and POVs on a purchase "allowable."  The allowables for electric wheelchairs and POVs vary significantly among the four DMERC subregions and among individual states within the DMERC subregions.  As an example, as listed in the table below,  the third Quarter 2004 purchase allowable or reimbursement amount for a new E1230 POV in California which is in DMERC Region D is $1,922.52.  The Third Quarter 2004 purchase allowable or reimbursement amount for a new K0011 electric wheelchair in California is $5,046.  The allowable differential between an E1230

POV and K0011 electric wheelchair in 2004 in California is $3,123.48.

|        | K0011      | K0010      | E1230      | K0001        |
|--------|------------|------------|------------|--------------|
| New    | $5,046.00  | $4,259.90  | $1,922.52  | $54.62/month |
| Used   | $3,784.00  | $3,194.93  | $1,520.49  |              |

146.    For all, or virtually all, of Defendant's tens of thousands of K0011 electric

wheelchairs provided to Medicare Part B beneficiaries by Defendant since at

least January 1994, the approximately $3,123 less expensive E1230 POV was

"a reasonably feasible and medically appropriate alternative pattern of care which

is less costly than the equipment furnished."

147.   All, or virtually all, of Defendant's tens of thousands reimbursement claims for

K0011 electric wheelchairs as indicated in the table above were over paid from at

least January 1994 to date  by Government Health Care Programs in the amount

of approximately $3,123 per claim.

148.    Defendant knew the E1230 POV was a reasonable, feasible and medically

appropriate alternative to the K0011 electric wheelchair for all or virtually all of

the tens of thousands of beneficiaries that Defendant provided with a K0011

electric wheelchair.  Defendant was at all times aware  that the E1230 POV was

a feasible,   reasonable  and medically appropriate less costly alternative when

knowingly and willfully filing false and fraudulent  Medicare Part B reimbursement

claims for K0011 electric wheelchairs.

149.   Defendant was at all times aware of requirement to provide the least costly

medically reasonable alternative equipment   and knowingly and willfully filed

false Medicare Part B reimbursement claims for electric wheelchairs provided to beneficiaries that Defendant knew were not that least costly alternative.

150.   From at least January 1994 to date, all of Defendant's reimbursement claims for K011 electric wheelchairs have been routinely certified by Defendant as the least costly medically reasonable alternative, regardless of the beneficiary's condition and regardless of the truth or falsity of that representation. The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

151.   Defendant, with knowledge of the false certifications, has routinely presented to Medicare, Medicaid, and other Government Health Care Programs false and fraudulent claims for payment of K0011 electric wheelchairs that were not the lowest cost alternative equipment.

152.   A sample list, with the beneficiary identities redacted, of false and fraudulent claims in which Defendant was paid for a K0011 electric wheelchair in lieu of a less costly E1230 POV providing the same therapeutic benefit is attached hereto as Exhibit C.

**E. False certifications and false claims for providing the K0011 electric wheelchair in lieu of the K0010 electric wheelchair as a less costly medically reasonable alternative**

153.      There are two basic types of electric wheelchairs covered by Medicare Part and typically provided to Medicare Part B beneficiaries. The programmable

electric wheelchair is a very sophisticated and expensive item of DME identified under the Health Common Procedure Coding System (HCPCS) (which identifies and "codes" the medical goods and services subject to a Medicare Part B reimbursement claim) as a K0011 electric wheelchair. The non-programmable electric wheelchair is a less sophisticated and much less expensive item of DME identified under the HCPCS as a K0010 electric wheelchair. The only difference (other than allowable amount) between the K0011 electric wheelchair electric wheelchair and the K0010 electric wheelchair is that the K0011 electric wheelchair is programmable. However, only a limited portion of the beneficiaries who qualify medically for an electric wheelchair require or can benefit medically from this programmability feature.

154.    The medical necessity coverage criteria for a K0011 electric wheelchair and a K0010 electric wheelchair are identical. The Certificate of Medical Necessity (CMN) whereby the beneficiary's treating physician certifies the medical necessity for electric wheelchairs and POVs makes no distinction between the medical necessity for K0010 electric wheelchairs and for K0011 electric wheelchairs. The CMN does not even reference in any way the need for the electric wheelchair programmable feature which is the sole distinction between a K0010 electric wheelchair and K0011 electric wheelchair, and the physician does not address this feature in any way in certifying medical necessity.

155.    On information and belief, the vast majority of physicians who certified the medical necessity for K0011 electric wheelchairs provided by Defendant to

Medicare Part B beneficiaries was not even aware of the operational difference between a K0010 electric wheelchair and K0011 electric wheelchair and had no idea of the relative therapeutic value of the two types of electric wheelchair for their patients.

156.     The determinations whether to supply Medicare Part B beneficiaries with a K0010 electric wheelchair or a K0011 electric wheelchair were made solely by Defendant.   Virtually all of the electric wheelchairs provided by Defendant to Medicare Part B beneficiaries since at least January 1994 have been the very expensive K0011 electric wheelchair, rather than the less expensive K0010.

157.     Medicare reimburses suppliers like Defendant for assigned Medicare Part B reimbursement claims for electric wheelchairs based on a purchase "allowable." The allowables for electric wheelchairs vary significantly among the four DMERC subregions and among individual states and other regions with the DMERC regions.  As an example, as listed in  the table below, the Third Quarter 2004 purchase allowable or reimbursement amount for a new K0010 electric wheelchair in California which is in DMERC Region D is $4,259.90.  The Third Quarter 2004 purchase allowable or reimbursement amount for a new K0011 electric wheelchair in California is $5,046.  The allowable differential between a K0010 electric wheelchair and K0011 electric wheelchair in 2004 in California is $786.10.

|  | K0011 | K0010 | E1230 | K0001 |
|---|---|---|---|---|
| New | $5,046.00 | $4,259.90 | $1,922.52 | $54.62/month |
| Used | $3,784.00 | $3,194.93 | $1,520.49 | |

158.    For all, or virtually all, of Defendant's tens of thousands of K0011 electric wheelchairs provided to Medicare Part B beneficiaries by Defendant since at least January 1994, the approximately $786 less expensive K0010 electric wheelchair was "a reasonably feasible and medically appropriate alternative pattern of care which is less costly than the equipment furnished."

159.   All, or virtually all, of Defendant's tens of thousands reimbursement claims for K0011 electric wheelchairs as indicated in the table above  were over paid from at least January 1994 to date  by Government Health Care Programs in the amount of approximately $786 per claim .

160.    Defendant knew the K0010 electric wheelchair was a reasonable, feasible and medically appropriate less costly alternative to the K0011 electric wheelchair for all or virtually all of the tens of thousands of beneficiaries that Defendant provided with a K0011 electric wheelchair.  Defendant was at all times aware that the K0010 electric wheelchair was a feasible,  reasonable  and medically appropriate less costly alternative when  knowingly and willfully filing  fraudulent and false Medicare Part B reimbursement claims for K0011 electric wheelchairs.

161.   Defendant was at all times aware of requirement to provide the least costly medically reasonable alternative  equipment  and knowingly and willfully filed false Medicare Part B reimbursement claims for electric wheelchairs and POVs provided to beneficiaries that  Defendant  knew were not that least costly alternative.

162.   From at least January 1994 to date, all of Defendant's reimbursement claims

for K0011 electric wheelchairs have been routinely certified by Defendant as the least costly alternative medically reasonable alternative, regardless of the beneficiary's condition and regardless of the truth or falsity of that representation. The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

163.    Defendant, with knowledge of the false certifications, has routinely presented to Medicare, Medicaid, and other Government Health Care Programs false and fraudulent claims for payment of K0011 electric wheelchairs that were not the lowest cost alternative equipment.

164.    A sample list, with the beneficiary identities redacted, of false and fraudulent claims in which Defendant was paid for a K0011 electric wheelchair in lieu of a less costly K0010 electric wheelchair providing the same therapeutic benefit is attached hereto as Exhibit C.


**F. False certifications and false claims for providing the fully-accessorized K0011 electric wheelchair in lieu of the base K0011 electric wheelchair as a less costly medically reasonable alternative**


165.    From at least January 1994 to date, Defendant was in the practice of adding "accessories" to almost every electric wheelchair that it provided to Medicare Part B beneficiaries.  These accessories are separately reimbursable by Medicare Part B according to their individual HCPCS identifiers.  These accessories included, but were not limited to, the following items (listed with the

corresponding DMERC Region C,  Texas 2002 allowables in parenthesis) :

   a.  K0021         anti-tipping devices  ($41.24)

   b.  K0093         rear wheel zero pressure tire tubes (flat free insert) ($302.26)

   c.  K0097         wheel zero pressure tubes (flat free insert) ($120.72)

   d.  K0031         seat belt/pelvic strap ($111.22)

   e.  K0058         seat depth 17"' or 18" ($60.07)

   f.  K0086         U-1 lead add batteries ($214.88)

   g.  K0083         22 NF gel cell batteries ($277.58)

   h.  K0085         group 24 gel cell batteries ($370.18).

166.     None of these accessory items provides a medical benefit *per se* and there are no medical necessity coverage criteria specific to these items.   The accessories can best be characterized as convenience and comfort items or "bells and whistles."

167.     The actual combination of these accessories which Defendant added onto the base K0011 electric wheelchair from at least January 1994 to date varied from beneficiary to beneficiary.   Virtually every beneficiary received some combination of these accessories, the actual mix being determined solely by the Defendant.   Typical combinations of these accessories would include at least five of the items (some of the items, *e.g.* the various tire/tube and battery options, would be mutually exclusive).   The total cost for a typical combination of six accessory items (the package of K0093, K0086, K0097, K0058, K0021 and K0031) provided to thousands of Part B beneficiaries by Defendant would be an

additional $850.39 in allowables in Texas in 2002.    From at least January 1994 to date, Defendant supplied very few, if any, base K0011 electric wheelchairs (*i.e.*, K0011 electric wheelchairs without any of these comfort and convenience accessories) to Medicare Part B beneficiaries.

168.    The decision whether to provide these accessories to Medicare Part B beneficiaries were made solely by Defendant.   Nothing in Section A of the Certificates of Medical Necessity (CMN) for electric wheelchairs utilized by Defendant from 1996 to date indicates whether these accessories were being provided to beneficiaries by Defendant.   Nothing in the physician responses in Section B of the CMN utilized by Defendant from 1996 to date addresses the medical necessity for these accessories.    The prescribing physicians were not even unaware whether or not their patients were being provided these accessories.

169.    For all, or virtually all, of Defendant's tens of thousands of electric wheelchairs provided to Medicare Part B beneficiaries by Defendant since at least January 1994, the approximately $5,046 base K0011 electric wheelchair was "a reasonably feasible and medically appropriate alternative pattern of care which is less costly than the equipment furnished" by Defendant which included some combination of the convenience and comfort accessory "bells and whistles."

170.    All, or virtually all, of Defendant's tens of thousands of Defendant's reimbursement claims for K0011 electric wheelchairs were over paid from at least January 1994 to date by Government Health Care Programs in the amount

54

of approximately $850 per claim.

171.     Defendant knew the base K0011 electric wheelchair was a reasonable, feasible and medically appropriate alternative to the fully-accessorized K0011 electric wheelchair for all or virtually all of the tens of thousands of beneficiaries that Defendant provided with a fully-accessorized K0011 electric wheelchair. Defendant was at all times aware that the base K0011 electric wheelchair was a feasible, reasonable and medically appropriate less costly alternative when knowingly and willfully filing false and fraudulent Medicare Part B reimbursement claims for fully-accessorized K0011 electric wheelchairs.

172.   Defendant was at all times aware of requirement to provide the least costly medically reasonable alternative equipment and knowingly and willfully filed false Medicare Part B reimbursement claims for fully-accessorized electric K0011 wheelchairs provided to beneficiaries that Defendant knew were not that least costly alternative.

173.   From at least January 1994 to date, all of Defendant's reimbursement claims for fully-accessorized K011 electric wheelchairs have been routinely certified by Defendant as the least costly medically reasonable alternative, regardless of the beneficiary's condition and regardless of the truth or falsity of that representation. The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

174.   Defendant, with knowledge of the false certifications, has routinely presented to Medicare, Medicaid, and other Government Health Care Programs false and

55

fraudulent claims for payment of fully-accessorized K0011 electric wheelchairs
that were not the lowest cost alternative equipment.

175.    A sample list, with the beneficiary identities redacted, of false and fraudulent
claims in which Defendant was paid for a fully-accessorized K0011 electric
wheelchair in lieu of a less costly   base K0011 electric wheelchair providing the
same therapeutic benefit is attached hereto as Exhibit C.

**G. False certifications and false claims for providing the K0011 electric
wheelchair in lieu of the K0001 standard manual wheelchair as a less costly
medically reasonable alternative**

176.    In addition to the two basic types of electric wheelchairs covered by
Medicare Part B and typically provided to Medicare Part B beneficiaries,
Medicare also covers standard manual wheelchairs. (There are many types of
manual wheelchairs, most or all of which could have been supplied to Medicare
beneficiaries in lieu of electric wheelchairs.   For simplicity, only the K0001
standard manual wheelchair alternative is addressed herein.)      The standard
manual wheelchair is a very inexpensive item when compared to the electric
wheelchair, and is identified under the Health Common Procedure Coding
System (HCPCS) as a K0001 standard manual wheelchair.

177.    The medical necessity coverage criteria for a K0011 electric wheelchair
and a K0001 standard manual wheelchair are very similar.   The only difference
is that for an electric wheelchair, the beneficiary must be unable to operate any
type of manual wheelchair. This inability to operate any type of manual
wheelchair is certified by the prescribing physician in the CMN.

178.     Although for some of Defendant's claims, beneficiaries supplied with electric wheelchairs by Defendant were unable to operate any type of manual wheelchair, on information and belief, a majority of the beneficiaries in Defendant's claims were able to operate some type of manual wheelchair.

179.     As discussed above, on information and belief, the documentation created by Defendant incident to sale in a majority of claims indicate that the beneficiary was using some type of manual wheelchair at the DOS or could operate some type of manual wheelchair at the DOS.  In addition, as also discussed above, the extensive sample of Defendant's IHOP delivery documentation reviewed by Plaintiff indicates that a great many beneficiaries were using some type of manual wheelchair at the DOS or could operate some type of manual wheelchair at the DOS.

180.     The decisions whether to supply Medicare Part B beneficiaries with a K0011 electric wheelchair in lieu of less costly equipment providing identical therapeutic value were solely made by Defendant.

181.     On information and belief, all of the mobility equipment provided by Defendant to Medicare Part B beneficiaries since at least January 1994 has been the very expensive K0011 electric wheelchair and relatively expensive E1230 POV, rather than the much less expensive K0001 standard manual wheelchair.

182.     Medicare reimburses suppliers like Defendant for assigned Medicare Part B reimbursement claims for electric wheelchairs based on a purchase "allowable."   Medicare, however, reimburses suppliers for standard manual wheelchairs on a different basis, the "caped rental" "allowable."   In simplified

form, the capped rental allows for suppliers to bill for up to 15 months of a monthly rental cycle. At some point in the capped rental cycle (usually after 13 months), title to the standard manual wheelchair transfers to the beneficiary. Since all of Defendant's CMNs certify as to a period of extended need, the typical payment to Defendant had Defendant supplied a standard manual wheelchair in lieu of an electric wheelchair would have been 15 months capped rental payments. The allowables for purchase of electric wheelchairs and capped rental of standard manual wheelchairs vary significantly among the four DMERC subregions and among individual states within the DMERC subregions. As an example, as listed in the table below, the Third Quarter 2004 monthly capped rental allowable for a K0001 standard manual wheelchair in California which is in DMERC Region D is $54.62/month. The 15-month capped rental total allowable is approximately $819.30 (15 x $56.42). The 2004 purchase allowable or reimbursement amount for a new K0011 electric wheelchair in the Third Quarter of 2004 in California is $5,046. The allowable differential between 15-month capped rental of a K0001 standard manual wheelchair and purchase of a K0011 electric wheelchair in 2004 in California is $4,226.70.

|      | K0011      | K0010      | E1230      | K0001        |
|------|------------|------------|------------|--------------|
| New  | $5,046.00  | $4,259.90  | $1,922.52  | $54.62/month |
| Used | $3,784.00  | $3,194.93  | $1,520.49  |              |

183.    For a majority of Defendant's tens of thousands of K0011 electric wheelchairs provided to Medicare Part B beneficiaries by Defendant since at least January 1994, the approximately $4,227 less expensive K0001 standard

manual wheelchair  was "a reasonably feasible and medically appropriate alternative pattern of care which is less costly than the equipment furnished."

184.   For a majority  of Defendant's tens of thousands reimbursement claims for K0011 electric wheelchairs as indicated in the table above were over paid from at least January 1994 to date  by Government Health Care Programs in the amount of approximately $4,227  per claim.   The current Local Medical Review Policy (LMRP)   pertaining to Motorized Power/Wheelchair Bases (which classification includes the  K0010 and K0011 electric wheelchairs) specifically provides, in pertinent part, that:

> If the documentation does not support the medical necessity
> of a power wheelchair but does support the medical necessity
> of a manual wheelchair, payment is made on the allowance of
> the least costly medically appropriate alternative.

*LMRP for Motorized/Power Wheelchair Bases (L11444) DMERC Region C DMEPOS Supplier Manual* (effective April 1, 2004).

185.    Defendant knew the  K0001  standard  manual  wheelchair  was  a reasonable, feasible and medically appropriate alternative to the K0011 electric wheelchair for all or virtually all of the tens of thousands of beneficiaries that Defendant provided with a K0011 electric wheelchair.  Defendant was at all times aware  that the K0001 standard manual wheelchair  was a feasible,  reasonable and medically appropriate less costly alternative when  knowingly and willfully filing false and fraudulent  Medicare Part B reimbursement claims for K0011 electric wheelchairs.

186.   Defendant was at all times aware of requirement to provide the least costly medically reasonable alternative  equipment  and knowingly and willfully filed

false Medicare Part B reimbursement claims for electric wheelchairs provided to
beneficiaries that Defendant knew were not that least costly alternative.

187.   From at least January 1994 to date, all of Defendant's reimbursement claims
for K011 electric wheelchairs have been routinely certified by Defendant as the
least costly medically reasonable alternative, regardless of the beneficiary's
condition and regardless of the truth or falsity of that representation.  The false
certifications of medical necessity were intended to support, and were used to
support, false and fraudulent claims for reimbursement submitted by Defendant
to Medicare, Medicaid, and other Government Health Care Programs.

188.   Defendant, with knowledge of the false certifications, has routinely presented
to Medicare, Medicaid, and other Government Health Care Programs false and
fraudulent claims for payment of K0011 electric wheelchairs that were not the
lowest cost alternative equipment.

189.   A sample list, with the beneficiary identities redacted, of false and fraudulent
claims in which Defendant was paid for a K0011 electric wheelchair in lieu of a
less costly K0001 standard manual wheelchair providing the same therapeutic
benefit is attached hereto as Exhibit C.


**H. False certifications and false claims for used electric wheelchairs and POVs
billed as new following "re-warranty"**

190.       From at least January 1994 to on or about April 2004, Defendant was in
the practice of picking up electric wheelchairs and POVs from beneficiaries after
the equipment had been in use in the home of the beneficiary for some period of

time.  Defendant or its manufacturer "re-warranted" some of the used equipment defendant reclaimed from beneficiaries and this "re-warranted" equipment was then supplied by Defendant to other beneficiaries and billed as new.

191.     There is no provision of the Medicare law or regulations which allows "re-waranteed" equipment previously provided to another beneficiary customer to be billed as new equipment.  New equipment is reimbursed by Medicare Part B at much higher allowables than used equipment.  As indicated in the table below, the allowable for a new K011 electric wheelchair in Region D in California in Third Quarter 2004 was $5,046 while the allowable for a used K011 electric wheelchair was only $3,784.  The allowable differential was $1,262.

|  | K0011 | K0010 | E1230 | K0001 |
|---|---|---|---|---|
| New | $5,046.00 | $4,259.90 | $1,922.52 | $54.62/month |
| Used | $3,784.00 | $3,194.93 | $1,520.49 |  |

192.   Hundreds of Defendant's reimbursement claims for new K0011 electric wheelchairs as indicated in the table above should have been paid as used and were over paid from at least January 1994 to date by Government Health Care Programs in the amount of approximately $1,262 per claim.

193.     Defendant knew that hundreds if not thousands or "re-warranteed" used electric wheelchairs and POVs provided to Medicare beneficiaries were not new.

194.     Defendant was at all times aware  that Medicare reimbursement was lower  for  used equipment and new equipment and knowingly and willfully filed false and fraudulent Medicare Part B reimbursement claims for new electric wheelchairs and POVs provided to beneficiaries that  Defendant  knew were,  in

fact  and under law, used.

195.    From at least January 1994 to date, all of Defendant's reimbursement claims for K011 electric wheelchairs have been routinely certified by Defendant as new, regardless of the truth or falsity of that representation.  The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

196.    Defendant, with knowledge of the false certifications, has routinely presented to Medicare false and fraudulent claims for payment for new K0011 electric wheelchairs that were used.


**I. False certifications and false claims for used electric wheelchairs and POVs billed as new following "re-delivery"**

197.       From at least January 1994 to on or about December 2003, Defendant was in the practice of picking up used electric wheelchairs and POVs from beneficiaries when a Medicare Part B reimbursement claim was denied for some reason other than lack of medical necessity.  These pickups would typically occur when the beneficiary some significant time after the initial DOS was determined for some reason to be ineligible, and the original reimbursement claim filed by Defendant was denied.  (Examples of such circumstances would include a denial because the beneficiary was in institutional care rather than the home setting or because the beneficiary was not age eligible for Part B).  At some subsequent date (which typically was many weeks or months later) when the non-medical

infirmity to Part B coverage had been cured, which latent period might be weeks or months, the Defendant would go to the beneficiary's home, pick up the equipment, drive around the block and re-deliver the same item of equipment and file a Medicare Part B reimbursement claim for the electric wheelchair or POV as new equipment.

198.     There is no provision of the Medicare law or regulations which permits such a practice or which provides that used equipment which is "re-delivered" to the same individual following use can be billed as new equipment.   New equipment is reimbursed by Medicare Part B at much higher allowables than used equipment.  As indicated in the table below, the allowable for a new K011 electric wheelchair in Region D in California in Third Quarter 2004 was $5,046 while the allowable for a used K011 electric wheelchair was only $3,784.  The allowable differential was $1,262.

|  | K0011 | K0010 | E1230 | K0001 |
|---|---|---|---|---|
| New | $5,046.00 | $4,259.90 | $1,922.52 | $54.62/month |
| Used | $3,784.00 | $3,194.93 | $1,520.49 | |

199.  Hundreds of Defendant's reimbursement claims for new K0011 electric wheelchairs as indicated in the table above should have been paid as used and were over paid from at least January 1994 to date by Government Health Care Programs in the amount of approximately $1,262 per claim.

200.     Defendant knew that hundreds if not thousands of re-delivered used electric wheelchairs and POVs provided to Medicare beneficiaries were not new.

201.     Defendant was at all times aware  that Medicare reimbursement was

63

lower for used equipment and new equipment and knowingly and willfully filed false and fraudulent Medicare Part B reimbursement claims for new electric wheelchairs and POVs provided to beneficiaries that Defendant knew were, in fact and under law, used.

202.    From at least January 1994 to date, all of Defendant's reimbursement claims for K011 electric wheelchairs have been routinely certified by Defendant as new, regardless of the truth or falsity of that representation. The false certifications of medical necessity were intended to support, and were used to support, false and fraudulent claims for reimbursement submitted by Defendant to Medicare, Medicaid, and other Government Health Care Programs.

203.    Defendant, with knowledge of the false certifications, has routinely presented to Medicare, Medicaid, and other Government Health Care Programs false and fraudulent claims for payment for new K0011 electric wheelchairs that were used.

## J. Discharge of Plaintiff in retaliation

204.    As described above, Plaintiff Carol Oren was Defendant's Director of Appeals and/or Appeals Officer from on or about June 2002 to on or about September 2004.

205.    As also described above, Plaintiff became aware of certain historical and current practices of Defendant which caused Defendant to file false and fraudulent reimbursement claims with Medicare Part B.

206.    Plaintiff shared her concerns regarding Defendant's filing of Medicare Part

B reimbursement claims with Defendant's senior management, line employees and legal counsel.

207.     Plaintiff investigated and acquired evidence of Defendant's filing false and fraudulent Medicare Part B reimbursement claims while employed by Defendant.

208.     On or about July 2004, Plaintiff met with Special Agents Victor Diaz and Michelle Lee of the Federal Bureau of Investigation to provide them with information regarding Defendant's filing of false and fraudulent Medicare Part B reimbursement claims.

209.     On or about May or June 2004, Plaintiff consulted counsel regarding the possibility of bring a *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

210.     On September 1, 2004, after bringing her concerns with Defendant's filing of Medicare Part B reimbursement claims to Defendant's senior management, line employees and counsel, to the FBI, and to counsel regarding the possibility of filing a *qui tam* claim under the False Claims Act, Plaintiff was discharged.  On information and belief, Plaintiff was discharged in part because of her lawful efforts to ensure Defendant's compliance with Medicare law and regulations.

211.     Defendant discharged Plaintiff in violation of 31 U.S.C. § 3730(h).

IX.

### Count One
**False or fraudulent claims for medically
unnecessary electric wheelchairs and POVs in violations of the
Federal False Claims Act - 31 U.S.C. § 3729, *et seq*.**

212.   Plaintiff realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 211 of her complaint.

213.   This   is a claim for treble damages, civil penalties, costs, expenses and

attorneys' fees, pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as

amended.

   **A. Causing to be presented, and presenting, false claims for medically
   unnecessary electric wheelchairs and POVs**

214.   Since at least January 1994, the Defendant has knowingly presented tens of

thousands of false or fraudulent claims to Government Health Care Programs,

consisting of claims for electric wheelchairs and POVs provided to beneficiaries

who did not meet the criteria for electric wheelchairs and POVs as a matter of

medical necessity, as required by Government Health Care Programs as a

condition of payment.

215.   Since at least January 1994, Defendant has knowingly caused to be

presented tens of thousands of false or fraudulent claims to Government Health

Care Programs for payment of medically unnecessary electric wheelchairs and

POVs.  The Defendant has made, used, and caused to be made and used, false

certifications of medical necessity, in support of the false or fraudulent claims for

medically unnecessary electric wheelchairs and POVs.

216.   These claims are false, because claims for electric wheelchairs and POVs